# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Mar 22, 2022
s/ DarylOlszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**Information That is Stored at Premises<br>Controlled by Google** | )<br>)<br>)<br>)<br>)<br>)    Case No.   22    MJ    53 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**See Attachment A. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A).**

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(i) | Arson of a commercial property. |

The application is based on these facts:
**See Attached Affidavit.**

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**ATF SA Luke Barker**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____**telephone**_____ *(specify reliable electronic means).*

Date: ___3/22/2022___

*Judge's signature*

City and state:   Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Jusge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent of the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since November 2015. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

2.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia. I have also completed training at the ATF National Academy. That training included various legal courses related to constitutional law, search and seizure authority, and specific training on explosives and arson investigations. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection. As a Special Agent with the ATF, I have responded to numerous fire scenes and been involved in multiple arson investigations. I have also received additional fire investigation training, including training at the Wisconsin International Association of Arson Investigators' 2019 annual conference. Before joining the ATF, I served for nearly eight years as a police officer with the Aurora Police Department in Aurora, Colorado.

3.      Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, are used to store and save audio, video, and text files that can link to a variety of criminal activity. These electronic devices often contain evidence about the custody and control of those devices, along with location information about

the device's whereabouts at the time of the crime. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

4.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and information provided to me by other federal, state, and local law enforcement officers.

6.      This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF THIS AFFIDAVIT

7.      I make this affidavit in support of an application for a warrant to search information that is stored at premises controlled by Google, an electronic communication service and remote computing service provider headquartered in Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose to the government the information further described in Attachment B.I. The government will then review that information and seize the information that is further described in Attachment B.II.

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United State Code, Section 844(i), arson of a commercial property were committed.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

9.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY**

10.      Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers.  Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

11.      I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their

environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

12. Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

13. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

14. Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

15. In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (*e.g.,* Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (*e.g.*, Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed in to their Google accounts. An individual can obtain a Google account by

registering with Google, and the account identifier typically is in the form of a Gmail address (*e.g.*, example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed in to a Google account.

16. Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

17. Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

18. According to my training and experience, as well as open-source materials published by Google, I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

19.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device.  Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data.  Google records the margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

20.     Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default.  A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History.  A Google accountholder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application. When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising.  As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

21.     Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

22.     Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

23.     Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (*i.e.,* session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that

reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## **PROBABLE CAUSE**

### **May 18, 2021, Fire**

24.     On May 18, 2021, at approximately 5:22 a.m., the Milwaukee Fire Department (MFD) and Milwaukee Police Department (MPD) were dispatched to 2626 N. 37th Street, Milwaukee, Wisconsin, on a report of a fire. Upon their arrival a fire was located and ultimately extinguished. The majority of the damage sustained by the fire was on the exterior of the southeast corner of the residence (*see Figure 1*). The residence is a two-story, multi-unit rental property.



*Figure 1*

25.     MPD located and interviewed two tenants of the residence. The tenant of the upper unit was identified as B.B., and the tenant of the lower unit was identified as S.H.

26.     In an interview with B.B., MPD learned that at approximately 5:20 a.m., one of the windows in B.B.'s residence shattered. B.B. went to see what had happened and observed a male, whom he identified as Christopher Gilmore, running away from the residence northbound through the alley. Gilmore was later identified as Christopher Gilmore (DOB: xx/xx/1983). B.B. informed MPD that shortly after this, he smelled something burning and discovered the back of the property was on fire.

27.     An MPD detective was assigned to investigate the fire. After examining the scene of the fire and conducting interviews of witnesses, the detective classified the fire as incendiary.

28.     On June 14, 2021, ATF Special Agents interviewed B.B. B.B. said in May of 2021, he met a male named A.L. through an on-line dating app. During their first few conversations, A.L. informed B.B. that he recently broke up with another male named Christopher Gilmore.

29.     B.B. informed ATF agents that a few days after meeting A.L., B.B. was contacted by Gilmore via phone. B.B. said Gilmore had used a phone that belonged to A.L. B.B. said Gilmore appeared to be angry with B.B. for speaking with A.L. and threatened to "set his house on fire." B.B. added that the next day, May 16, 2021, Gilmore made contact with B.B. in person outside of B.B.'s residence. B.B. said Gilmore identified himself as the person who had contacted him the day before. ATF agents showed a drivers' license photograph of Gilmore to B.B. B.B. identified the person as Gilmore.

30.     B.B. informed ATF agents that at approximately 5:00 a.m. on May 18, 2021, he was asleep in his bedroom when he was woken by the sound of a window breaking. B.B. said he looked out of the window and observed a male running northbound towards the alley.

B.B. said the male was tall with a slim build, wearing black pants and a black hoodie. B.B. said the body type matched that of Gilmore. B.B. stated a few minutes later he was in his kitchen and smelled something burning and then discovered the fire to the east side of the residence.

### June 1, 2021, Fire

31.     On June 1, 2021, at approximately 4:34 a.m., members of the MPD were dispatched to 3826 W. Meinecke Avenue, Milwaukee, Wisconsin, on a call of a vehicle fire. The target vehicle was a red in color 2003 Buick Lesabre. The vehicle sustained major fire damage (*see Figure 2).*



*Figure 2*

32.     MPD identified the registered owner of the Buick to be T.W. MPD discovered T.W. was in a romantic relationship with A.L. A.L. was previously in a relationship with Gilmore.

33.     MPD discovered an exterior video surveillance camera located at 3823 W. Meinecke Ave. MPD reviewed the surveillance footage and observed a person approach the Buick from the east, light an object on fire and throw the object into the passenger side of the Buick.

34.     An MPD detective was assigned to investigate the fire. After examining the scene of the fire, conducting interviews of witnesses and observing the available video surveillance, the detective classified the fire as incendiary.

### September 23, 2021, Fire

35.     On September 23, 2021, at approximately 10:37 p.m., MPD was dispatched to an additional fire at 3826 W. Meinecke Avenue, Milwaukee, Wisconsin. MPD personnel met with members of MFD who had already extinguished a fire that was on the porch on the east side of the residence. 3826 W. Meinecke Ave is a two story, multi-unit rental property.

36.     An MPD detective was assigned to investigate the fire. After examining the scene of the fire and conducting interviews of witnesses, the detective classified the fire as incendiary.

37.     On September 24, 2021, the MPD detective conducted follow up and attempted to contact Gilmore at 3821 W. Walnut Street. This address is the residence of Gilmore's sister, C.G. The detective was unable to make contact with Gilmore at that address but did ask C.G. for Gilmore's phone number. C.G. informed the detective that Gilmore's phone number was 414-386-3343. The detective than observed C.G. dial the number she provided for Gilmore in an attempt to contact him.

38.     On October 5, 2021, ATF agents conducted an interview with T.W., one of the tenants in the lower unit of 3826 W. Meinecke Avenue. T.W. stated that on the night of September 23, 2021, he and his roommate A.L., were inside the residence at 3826 W. Meinecke. T.W. stated he observed a flash of light coming from outside of his bedroom window. He stated he looked outside of the window and observed Gilmore lighting a small amount of garbage outside of the bedroom window (*see Figure 3*).



*Figure 3*

39.     T.W. informed ATF agents he exited the residence to confront Gilmore. Upon

exiting the residence, he observed Gilmore running eastbound away from the residence. T.W.

also stated he observed his porch was on fire when he exited his residence.

40.     On October 6, 2021, ATF agents conducted an interview with A.L., a

roommate of T.W. and one of the tenants in the lower unit of 3826 W. Meinecke Avenue.

A.L. informed ATF agents he and T.W. were in a bedroom in their residence on the night of

the fire. A.L. stated T.W. observed a flash of light coming from outside the bedroom window.

A.L. stated both he and T.W. looked outside the window, and both saw Gilmore attempting to

light a fire. A.L. stated he and T.W. exited the residence. A.L. stated T.W. exited the residence

before him and observed Gilmore running away. However, A.L. stated by the time he exited

the residence he did not do so in time to see Gilmore. A.L. stated he observed the porch was

on fire when he exited the residence. The fire damaged the northern section of the porch (*see*

*Figure 4*).



*Figure 4*

41.     During the interview, A.L. provided ATF agents a phone number for Gilmore. The phone number he provided was 414-386-3343.

42.     Since the interview with A.L., A.L. has contacted your affiant and stated that he is recanting his earlier statement that he saw Gilmore lighting a fire at 3826 W. Meinecke Avenue on September 23, 2021.

43.     According to a law enforcement database, phone number 414-386-3343 was a customer of phone service provider TextNow, Inc.

44.     On or about November 15, 2021, ATF agents served a federal grand jury subpoena on TextNow, Inc. for subscriber information pertaining to accounts associated with TextNow number 414-386-3343.

45.     On or about November 15, 2021, TextNow, Inc. responded to the ATF agent with the requested records and confirmed the following as one of the TextNow usernames: ijiahgilmore.

46.     TextNow also included the phone ownership dates, or the date range the number was used by the associated username. Username ijiahgilmore owned TextNow phone

number 414-386-3343 for the dates of June 10, 2021, to September 23, 2021. September 23, 2021, was the date of the third fire.

*47.* In November 2021, ATF agents were contacted by T.W. T.W. informed ATF agents of threatening messages A.L. received from phone number 414-895-7397. T.W. stated the phone number 414-895-7397 belonged to Gilmore.

48. According to a law enforcement database, phone number 414-895-7397 was a customer of phone service provider TextNow, Inc.

49. On or about January 19, 2022, ATF agents served a second federal grand jury subpoena on TextNow, Inc. for subscriber information pertaining to accounts associated with TextNow number 414-895-7397.

50. On January 20, 2022, TextNow, Inc. responded to ATF with the requested records, and confirmed the following as one of the TextNow usernames: ijiahgilmore. In addition to the matching username, the name "Ijiah Gilmore" and email address keykeytoles@gmail.com matched that of the username associated with TextNow number 414-386-3343.

51. The phone ownership dates for username ijiahgilmore associated with TextNow phone number 414-895-7397 were from May 19, 2021, (the day after the first fire) to June 10, 2021. The day username ijiahgilmore ended its ownership of TextNow phone number 414-895-7397 was the same day username ijiahgilmore began its ownership of TextNow phone number 414-386-3343.

52. ATF agents used a law enforcement database to attempt to locate a possible email address used by Gilmore. ATF agents were able to locate the following email address associated with Gilmore: ijiahgilmoresafforld1982@gmail.com.

53. Based on my training and experience, as well as information conveyed to me by other law enforcement officers, which information I find to be reliable and credible, I know that it is common for individuals who commit arsons to carry mobile devices at the time of the commission of the crime. Based upon my training and experience, I also know that it is common for information obtained from mobile devices, to include location data, to assist in investigating criminal offenses, to include arsons. Therefore, I believe that there is a high likelihood that that the individual(s) who committed the criminal activity described in the preceding paragraphs carried a mobile device.

54. Based on the aforementioned facts documenting the violations of Title 18, United State Code, Section 844(i), I submit that there is probable cause to search information that is currently in the possession of Google and that relates to the devices that reported being within the Target Locations described in Attachment A during the time period described in Attachment A for evidence of the crimes under investigation. The information to be searched includes (1) identifiers of each device; (2) the location(s) reported by each device to Google and the associated timestamp; and (3) basic subscriber information for the Google account(s) associated with each device.

55. The proposed warrant sets forth a multi-step process whereby the government will obtain the information described above. Specifically, as described in Attachment B.I:

  a. Using Location History data, Google will identify those devices that it calculated were or could have been (based on the associated margin of error for the estimated latitude/longitude point) within the Target Location described in Attachment A during the time period described in Attachment A. For each device, Google will provide a anonymized identifier, known as a Reverse Location Obfuscation Identifier ("RLOI"), that Google creates

and assigns to device for purposes of responding to this search warrant; Google will also provide each device's location coordinates along with the associated timestamp(s), margin(s) of error for the coordinates (*i.e,*. "maps display radius"), and source(s) from which the location data was derived (*e.g.*, GPS, wi-fi, bluetooth), if available. Google will not, in this step, provide the Google account identifiers (*e.g.,* example@gmail.com) associated with the devices or basic subscriber information for those accounts to the government.

b.   The government will identify to Google the devices appearing on the list produced in step 1 for which it seeks the Google account identifier and basic subscriber information. The government may, at its discretion, identify a subset of the devices.

c.   Google will then disclose to the government the Google account identifier associated with the devices identified by the government, along with basic subscriber information for those accounts.

56.   This process furthers efficiency and privacy by allowing for the possibility that the government, upon reviewing contextual information for all devices identified by Google, may be able to determine that one or more devices associated with a Google account (and the associated basic subscriber information) are likely to be of heightened evidentiary value and warrant further investigation before the records of other accounts in use in the area are disclosed to the government.

## **CONCLUSION**

57.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

58.     I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

## Property To Be Searched

This warrant is directed to Google LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, reflecting devices that Google calculated were or could have been (as indicated by margin of error, *i.e.,* "maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) Identifying information for Google Accounts associated with the responsive Location History data.

### LOCATION 1 - Initial Search Parameters

- Date: May 18, 2021
- Time Period: 05:15 AM to 05:25 AM (CST)
- Target Location:   Geographical area identified as:
  (NW Corner) 43.066725, - 87.959667; (NE Corner) 43.066731, - 87.959264;
  (SE Corner) 43.066639, - 87.959539; (SW Corner) 43.066653, - 87.959661;
- Also approximately depicted using the following image:



<u>LOCATION 2 - Initial Search Parameters</u>

- Date: June 1, 2021
- Time Period: 04:15 AM to 04:20 AM (CST)
- Target Location:   Geographical area identified as:
  (NW Corner) 43.062608, -87.962114; (NE Corner) 43.062606, -87.961553;
  (SE Corner) 43.0625, -87.961556; (SW Corner) 43.0625, -87.962108;
  Also approximately depicted using the following image:



<u>LOCATION 3 - Initial Search Parameters</u>

- Date: September 23, 2021
- Time Period: 10:10 PM to 10:25 PM (CST)
- Target Location:  Geographical area identified as:
(NW Corner) 43.062608, -87.962114; (NE Corner) 43.062606, -87.961553;
(SE Corner) 43.0625, -87.961556; (SW Corner) 43.0625, -87.962108;
Also approximately depicted using the following image:



## ATTACHMENT B

### Particular Items to Be Seized

**I.        Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.        Google shall query location history data based on the Initial Search Parameters specified in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.        The government shall review the Device List and identify to Google the devices about which it seeks to obtain Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.        Google shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Accounts associated with each device ID appearing on the Device List about which the government inquires.

**II.        Information to Be Seized**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 841(i), (arson of a commercial property) involving Christopher Gilmore.